IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 7, 2009 Session

**CARROLL C. MARTIN, v. JIMMY BANKSTON, et al.**

**Appeal from the Chancery Court for Hamilton County**
**No. 07-0145      Hon. Howell N. Peoples, Chancellor**

**No. E2009-00993-COA-R3-CV - FILED FEBRUARY 24, 2010**

Plaintiff sued defendants, seeking to enforce the restrictive covenants on defendants' property as to an outbuilding constructed on defendants' property and seeking an injunction against defendants' alleged operation of a business on their premises in violation of the restrictive covenants. The Trial Court ruled in favor of defendants, and plaintiff has appealed. We affirm the Judgment of the Trial Court.

**Tenn.  R. App. P.3 Appeal as of Right; Judgment of the Chancery Court Affirmed.**

HERSCHEL PICKENS FRANKS, P.J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., J., and. D. MICHAEL SWINEY, J., joined.

Bryan B. Martin, Johnson City, Tennessee, for the appellant, Carroll C. Martin.

James W. Clements, III., Chattanooga, Tennessee, for the appellees, Jimmy Bankston and Cathy Bankston.

**OPINION**

Plaintiff's Complaint against the defendants alleged that both parties own property in the Morning Glory Farms development, and that defendants had violated the restrictive covenants. Further, that defendants built an outbuilding that violated the covenants, and they partially operated a business, Bankston Heating and Air, from this property, in violation of the covenants.

Defendants Answered, denying they had violated any of the covenants, and denied that their

garage was not in compliance with the restrictions, and that plaintiff had waived any right to enforce the covenants because there had been numerous other violations in the neighborhood.

The parties entered an agreed Protective Order, which stated that certain documents, including the tax returns and other financial documents of Bankston Heating & Air and Mr. and Mrs. Bankston would be filed under seal.

After the Court denied a Motion for summary Judgment an evidentiary hearing was held and plaintiff was the first witness. He testified that he was retired, but had been involved in the development of Morning Glory Farms. Plaintiff identified the restrictions that applied to the defendants' property, and the restrictions stated that the tracts were to be residential and the restrictions further stated that each resident had to provide a garage space for a minimum of two cars.

Plaintiff testified the defendants' home, as it was originally built, had a two car attached garage, but that defendants later enclosed it and converted it into living space. Plaintiff testified that he became aware they were engaging in a commercial activity, when they erected a large outbuilding on their property and put a sign out front that said Bankston Heating & Air. He said he told defendants they could not operate the business on the property, and the sign disappeared. Plaintiff later saw a listing in the yellow pages for Bankston Heating & Air with defendants' home address.

He further testified that there were about 200 homes in Morning Glory, but only 7 other homes were subject to the same restrictions as defendants'.

Plaintiff admitted that Bankston testified in his deposition that he had lived in that house for 15 years, and had operated his business the entire time. Plaintiff admitted that he had no idea about the business until 2006, and that he had not seen any commercial activity occurring at defendants' home, other than on an occasion seeing an HVAC unit sitting on a trailer. He said he had no problem with defendant answering the phone for his business at his home, and that he had no problem with a detached garage when the home was large. He admitted that the house next door to defendants had a detached garage.

Plaintiff testified that he had drafted the restrictive covenants, and the restriction did not say "no commercial activity".

Bankston was the next to testify, and said that he purchased the property in 1992, and he was employed in the heat and air business as a service technician at the time. He said he had his business license at that time, and then opened his own service business in the mid-1990's. He said that he parked his business van at his home, but otherwise his business activities were not open and obvious, and the only employees were him and his wife, and all other technicians were subcontractors. He said they had no other office besides their residence, and his wife did bookkeeping and billing for the company from his home.

Bankston testified that his distributor placed the phone book ad and not him, so he was not

aware of it until it was shown to him. He testified that he did not do any advertising on his own, and that his company serviced and installed heat and air units all away from his premises. He testified that they built an outbuilding on their property in 2001, which was approximately 100 feet from the house, and that only about twice a year he might have an HVAC unit on his trailer overnight. He testified that the outbuilding was built with the intention of having more storage for lawn mowers and such, and that they later enclosed their attached garage in 2003 or 2004, and that the money for the outbuilding came from their personal account.

On cross-examination, Bankston admitted that his business tax returns listed his home address, and that they showed the company paying rent to him and his wife for the use of the home. He testified that the way his business operated was that a customer would call him for service and he would go to the customer's home and perform his services at that address. He said he kept no inventory at his home, and only on a few occasions would pick up a unit in the afternoon and store it at his house to take to a site the next morning. He said customers did not come to his house, and he did not do any fabrication work at his home, and had no signs out on the lawn. He admitted on one occasion that he put a "job site" sign at his residence, which he would do at any residence where he was working which advertised his services, and at the time he put one in front of his house, he was replacing his own unit.

Following an evidentiary hearing, the Trial Court said that defendants receiving calls at their home was no different than lawyers, doctors, plumbers, etc., who received calls at home and then took their tools and went elsewhere to do the work. The Court found the residence was primarily used for a residence, and only incidentally used for commercial activity. The Court held that this activity would not violate the restriction, because there was no evidence that any service work took place at the home.

Regarding the garage, the Court found that plaintiff testified that it was okay to have a detached garage if the house was large enough. The Court found the developer could not pick and choose how the restrictions could be enforced, and that the restrictions were somewhat ambiguous, because number one said that other structures could be built, and number three said that there had to be garage space to accommodate two cars, but did not say that the garage had to be attached to the dwelling.

In the Court's final Order, the Court held that the evidence did not prove sufficient commercial activity to rise to the level precluded by the restriction, and that the restriction as to the outbuilding was ambiguous as to whether the garage had to be attached to the dwelling. The suit was dismissed.

On appeal, plaintiff raises these issues:

1.      Whether the Trial Court erred in concluding that plaintiff's evidence failed to prove commercial activity by the defendants in violation of the restrictive covenants?

2. Whether the Trial Court erred in concluding that the restrictive covenant applicable to garages was ambiguous as to whether the garage had to be attached to the dwelling?

Plaintiff insists the Trial Court erred in finding that plaintiff failed to show sufficient commercial activity by defendants to violate the restrictive covenants. The applicable restriction states that all "tracts in the development shall be used, known and described as residential tracts." It goes on to state that, "No building or structure shall be erected, altered, placed, or permitted to remain on any residential tract other than a single-family residential dwelling and, if any, its customary and usual accessory structures, and those structures that are customary and usual to a ranch or farm." Further, plaintiff insists that defendants violated these covenants by operating a heating and air service business from their home.

The evidence established that defendants kept books and records at the residence, answered the phone at the residence and took service calls, and then went out to individuals' homes to perform the work. Defendants had an ad in the yellow pages that advertised their business with a number that they answered at their home and their home address. Defendants had a business license and filed business tax returns showing a profit for the business. There were no signs or other indicia of a business at the home, except that Mr. Bankston testified that once or twice a year he would have an HVAC unit on his truck overnight, to take to a job site the next morning. The business has no employees, no customers come to the home, and no deliveries are made to the home.

We conclude from the evidence that the home was being used for residential purposes and not commercial purposes, in violation of the restrictions as found by the Trial Court. While defendant answered the phone for service calls at home and kept his business records there, no work was performed at the residence, other than bookkeeping.

Appellant argues this case is similar to the case of *Kerney v. Endres*, 2009 WL 1871933 (Tenn. Ct. App. June 30, 2009), where the defendants were operating a beauty salon from their home. In that case, the restrictions stated that the use of the property was to be "exclusively residential" and that there should be no "commercial undertaking". *Id*. Defendants had converted a room in their home to a beauty salon, where they worked by appointment only, a few days per week. *Id*. They estimated that they saw 63 customers per month there, and earned a profit. *Id*. They had no signs nor any other exterior indicia of the business, and did not have any employees, and received no business deliveries there. *Id*.

The Trial Court ruled that the use of the residence as a beauty salon was merely incidental and did not violate the restrictions, but this Court disagreed. *Id*. This Court stated:

The courts enforce restrictions according to the clearly expressed intentions of the parties manifested in the restrictions themselves. We give the terms used in restrictions their fair and reasonable meaning, and we decline to extend them beyond their clearly expressed scope. We also construe the terms of a restriction in light of the context in which they

-4-

appear.

> When the restriction's terms are capable of more than one construction, we should adopt the construction that advances the unrestricted use of the property. . . . [W]e should resolve all doubts concerning a covenant's applicability against applying the covenant.

*Kerney,* at p. 4, *quoting Maples Homeowners Ass'n, Inc., v. T & R Nashville Ltd. Partnership*, 993 S.W.2d 36 (Tenn. Ct. App. 1998). We held that the restriction in that case was clear and unambiguous and prohibited operation of a beauty salon in the subdivision, as it stated that the property was to be used only for residential purposes, and also contained a "broad negative prohibition against 'any commercial undertaking.'" *Kerney*, at p. 5.

It is not disputed that the restrictions in this case state that the property is to be used for residential purposes, just as the restrictions did in *Kerney.*[1] They do not, however, contain the secondary prohibition against any commercial activity, but that is not dispositive in this instance. The *Kerney* case is clearly distinguishable. The activity taking place in this case, as opposed to the commercial activity shown in *Kerney*, is that *Kerney* involved a business that was operated completely on the subject property, such that customers came to the home to have a service performed. All income generated by the beauty salon was generated on the premises, *vis a vis* this case wherein no activity (other than record keeping and answering the phone) occurred on defendants' property. No customers or employees come to the home, no deliveries were brought there, and no equipment or inventory was kept at the home. There is no outward indicia of any business activity at the home, and no income-generating work takes place in the home.

Other cases that have a found a similar violation involved significant activity taking place on the subject property, such as using the home as a "tourist home" or a vacation rental property, which this Court found to be in the same usage as a hotel, or where personal training services were performed within a gym inside the home. These usages involved the general public coming to the residential property and all business activity taking place thereon. *See Carr v. Trivett*, 143 S.W.2d 900 (Tenn. Ct. App. 1940); *Shields Mtn. Prop. Owners Ass'n, Inc. v. Teffeteller,* 2006 WL 408050 (Tenn. Ct. App. Feb. 22, 2006); *Island Brook Homeowners Ass'n, Inc. v. Aughenbaugh*, 2007 WL 2917781 (Tenn. Ct. App. Oct. 5, 2007); *Kerney*, *supra*. These authorities are clearly distinguishable from the instant case, and the Trial Court properly found that the activity involved in this case did not rise to the level of a violation of the restrictive covenant. Clearly, defendants' property in the words of the restrictive covenant is "used, known and described" as residential property.

Plaintiff also argues that the Trial Court erred in ruling that the restrictive covenant regarding garages was ambiguous as to whether the garage had to be attached to the dwelling. As we have noted, restrictive covenants must be strictly construed, and any ambiguity must be resolved against applying the covenant. The restriction at issue states that "[e]ach single-family residential dwelling

---

[1]In *Kerney*, the restriction is "exclusive residential" *vis a vis* herein "known and described" as residential.

erected on any tract in the development shall provide garage space for a minimum of two conventional automobiles." As the Trial Court found, this paragraph is ambiguous regarding whether the garage space must be attached to the dwelling. Plaintiff testified that he authored the restrictions at issue, and he did not believe that the garage had to be attached if the house itself was large enough. As such, we "adopt the construction that advances the unrestricted use of the property." *Kerney,* at p. 4. We therefore affirm the Trial Court's finding that the defendants' property violated none of the restrictive covenants.

The Judgment of the Trial Court is affirmed, and the cause remanded, with the cost of the appeal assessed to the plaintiff, Carroll Martin.

_____
HERSCHEL PICKENS FRANKS, P.J.